[Civ. No. 20654.   Second Dist., Div. One.   Apr. 18, 1955.]

UNITED AIR LINES, INC. (a Corporation), Appellant, v. WESTERN AIR LINES, INC. (a Corporation), Respondent.

Trippet, Newcomber, Yoakum & Thomas and F. B. Yoakum, Jr., for Appellant.

Guthrie, Darling & Shattuck, Hugh W. Darling and Donald K. Hall for Respondent.

WHITE, P. J.—Plaintiff, United Air Lines, Inc., hereafter for convenience referred to as "United," has appealed from a judgment in its favor for $442.73. By its complaint, as amended during the trial, it sought to recover $8,026.43 from defendant, Western Air Lines, Inc., hereafter referred to as "Western."

In May, 1947, Western leased to United one of Western's planes. On December 4, 1947, while the plane was in the possession of United, it was damaged. United immediately notified Western, and Western's former insurance underwriter, of the damage and repaired the plane at its own cost. In accordance with the lease, the airplane was returned to Western on December 26, 1947. It was then in the same condition as when delivered by Western to United in May. For the use of the plane during that time, United paid to Western as daily rental and hourly overhaul charges the sum of $115,640.15.

The lease agreement was in writing and included the following provisions:

"7. (a) United agrees to indemnify and save Western harmless against any and all expense, loss or damage caused by or arising out of, in whole or in part, the possession or operation by United of said aircraft and any engines or equipment leased or supplied hereunder, not caused by Western's negligence.

"(b) United shall be responsible and shall reimburse Western for any and all damage to said aircraft and any engines, propellers, parts, accessories and radio equipment installed therein or attached thereto or supplied to United hereunder

while the same are in United's possession, not caused by Western's negligence.

"(c) If said aircraft when in the possession of United is destroyed or is so damaged that the estimated cost of repair or restoration of said aircraft exceeds the value of said aircraft at the date of such damage or destruction, then in that event Western shall promptly transfer and assign to United all of Western's right, title and interest, free and clear of all liens and encumbrances, in said aircraft. In return therefor, United shall pay to Western the full value of said aircraft, which is agreed to be the sum of $325,000.00.

"(d) In the event of any damage to said aircraft not constituting destruction or such damage as is covered in subparagraph (c) of this paragraph, United shall continue to be responsible for the payments for the use of said aircraft during the period in which said aircraft is being repaired by United in addition to being responsible for all costs of said repair.

"(e) United shall in no way be responsible for said aircraft while it is in the possession of Western, and Western shall be responsible for its own negligence, irrespective of which party hereto has possession of said aircraft.

"8. During the time that United shall have in its possession the aircraft leased hereunder, it shall maintain in full force and effect at its own expense insurance policies written by responsible insurance companies insuring and covering Western and United as their interest may appear against liability for loss, injury, damage or claims arising out of, or in connection with injuries to, or deaths of, passengers, injuries to, or deaths of, third persons, and damage to, or destruction of property, caused or arising out of the operation of said aircraft, such insurance to be maintained by United in the following amounts and with the following limits:

"Passenger Liability Insurance—$75,000 for each passenger, with a limit of $2,000,000 for any one accident;
Public Liability Insurance—$50,000 for each person, with a limit of $1,000,000 for any one accident;
Property Damage Insurance—$500,000 for any one accident;
Excess Liability Insurance—$2,000,000 per accident to be applicable jointly to all three of the above-said risks.
*Hull insurance acceptable to War Assets Administration and United will be procured by Western and paid for by United.*" (Emphasis added.)

Paragraphs 7 and 8 of the lease agreement have been quoted in full in order to examine in context the portions thereof relied upon by the respective parties.

When the lease was signed, the hull insurance on Western's fleet was carried by Springfield Fire and Marine Insurance Company. The policy insured the leased plane for $350,000 with $25,000 deductible, leaving the maximum collectible hull insurance for total loss $325,000, which is the same amount United agreed in paragraph 7(c) to pay to Western in event the airplane was destroyed. War Assets Administration was then mortgagee of the plane and had approved the Springfield policy. To avoid the red tape incident to securing its approval of another policy, it was agreed that the leased plane should continue to be insured under the Springfield policy as a part of Western's fleet; that Western would bill United monthly for its portion of the premium and United would pay Western therefor as billed. For the term of the lease, United paid to Western hull insurance premiums totaling $7,959.73.

After advising Western and the Springfield policy underwriters of the accident on December 4th, United next wrote to Western under date of December 12th tentatively estimating the amount of damage "in the neighborhood of $40,000.00" and stating, "It is our understanding from the lease we negotiated with your company for this airplane that Western Air Lines maintains crash insurance which would be applicable to this loss. This lease also indicates that the cost of this insurance is charged to United Air Lines on a monthly basis."

On December 5th, Western wrote to the underwriters of the Lloyd's policy advising them of the accident, quoting paragraphs 7 and 8 of the lease agreement, and stating ". . . it was decided that the hull insurance would be carried under our policy with United reimbursing us for the premium."

Western by letter dated December 13th acknowledged receipt of a copy of United's letter of the 4th to its former underwriters, and stated that the Springfield policy "expired on November 1, 1947, and effective that date the coverage was placed with Lloyd's of London." In said letter of the 13th, Western also stated that "the airplane is valued at $275,000 for insurance purposes and the policy contains a deductible clause of 5% of the insured value for claims for loss or damage occurring while the airplane is in flight."

This is followed by information concerning "a retrospective rate credit," also referred to herein as a "no claim bonus," in the event no losses occur during the policy year, the statement that "As a matter of procedure we will file claims as they arise and in the event that claims for the year are less than the credit to which we would be entitled if the losses had not accrued we will repay the insurance company the amount paid to us in claims and take the retrospective credit." The letter closes with the following paragraph:

"We suggest therefore that United Air Lines pay us the entire amount of the cost of the repairs, less 5% of $275,000, with the understanding that if our experience aside from this accident is such that we are not entitled to the retrospective rate credit we will reimburse you in the amount by which the amount you have paid to us exceeds the amount fixed by the deductible provisions of our new policy."

On December 22d, United answered Western's letter of the 13th, in part, as follows: "... *we think the best way to handle this is for you to reimburse United Air Lines in the amount over and above your deductible and then follow your own wishes as to whether or not you care to report this loss to Lloyds. This handling will still allow you to obtain any credit that might be due and also will enable United Air Lines to be reimbursed more promptly.*" (Emphasis added.)

According to the uncontroverted testimony of Mr. Sullivan, secretary of Western, who handled all its dealings with United regarding the leased plane and United's insurance claim, no information regarding the change of insurance coverage was given to United by Western until December 12, 1947 (eight days after the accident); the premiums of 3.956 per cent on the Springfield policy and 5 per cent plus federal tax on the Lloyd's policy had been paid by United monthly as billed; he, Sullivan, knew from December 12, 1947, that United was expecting Western to process its insurance claim; he knew from December 22, 1947, that United was repairing the airplane at its own expense and would advise Western as to the cost of repairs so that United's insurance claim could be processed by Western; United's invoice for $8,026.43 was received about August 9, 1948; and on August 23, 1948, Western wrote United as follows:

"On the assumption that our experience between now and November 1, 1948 will be as good as it has been since November 1, 1947, and in view of the fact that, if that assumption

be correct, *payment of your Invoice Number 8-242 at this time would give rise to a claim recoverable from United under the provisions of subparagraphs (a) and (b) of Article 7 of the lease agreement covering the leasing of this airplane,* we will hold your invoice until such time as our experience has actually been determined." (Emphasis added.)

Mr. Sullivan, of Western, also testified that the invoice was returned to United about March 1, 1949; that there was no question "as to the correctness of the amount shown in the invoice"; that the paragraph last above quoted was a statement of Western's reason for not filing United's claim with the insurance company; and further testified as follows:

"Q. In other words, you declined to file the claim because of your contention that if you had done so you would have been deprived of your no claim bonus with a resultant loss to you and your further contention that if this had happened you would have been entitled to go back and recover it from United by virtue of the indemnity agreement? A. Yes, that was the reason we did not file the claim.

"Q. And that is also the reason why you didn't pay the invoice? A. That is right.

"Q. You don't know of any other reasons why the claim was not filed or the invoice not paid by you? A. No, sir."

Mr. John Spencer, manager of the Lloyd's Department of Swett & Crawford, West Coast representative of Lloyd's of London, a witness called by Western, testified that Western's letter of December 5, 1947, "was sufficient notice of the claim" arising out of United's accident; and that Western "could have collected the claim as a claim up until the time they requested the no claim bonus," on or about February 29, 1949.

The record before us on the instant appeal discloses no controversy as to any of the foregoing facts. Also, without conflict, the record shows that Western's losses above deductibles (exclusive of United's claim) amounted to $23,255.24; its no claim bonus was $30,147.02; and that consequently Western's collectible losses (including United's claim for $8,026.43) actually exceeded the no claim bonus by $864.65. From $864.65, the court subtracted $421.92, the amount Western had paid to United when its invoice was returned, and awarded judgment for United for the difference, $442.73.

From the record as a whole, it is apparent that the trial court concluded, as we have concluded, that United was en-

titled to the amount of its claim, as invoiced to Western, for $8,026.43; and the trial court further found and concluded that Western was entitled to an offset of $7,161.78 "which represents the net difference between the amount of no claim bonus received under said policy and the total amount of insurance claims Western could have presented and claimed on said insurance policy arising out of damage incurred by Western on aircraft other than the damage on the airplane caused by United" and that Western was "entitled to be reimbursed and indemnified by United for such loss and damage pursuant to the provisions of . . . paragraph 7(a) . . . "; and such damage and loss to Western was caused by, or arose out of, and by reason of "the possession or operation by United of the airplane and not caused by Western's negligence."

No appeal from the judgment having been taken by Western, we will not here consider its arguments regarding its affirmative defenses of estoppel and accord and satisfaction, which were found to be untrue by the trial court.

Therefore, as stated in United's opening brief, the judgment should be affirmed if the trial court's interpretation of the indemnity clause in paragraph 7(a) of the lease is correct. And, if the trial court erred in deciding that Western was entitled to offset said sum of $7,161.78 under the provisions of said paragraph 7(a), then the judgment for United should be reversed with directions that the amount thereof be changed from $442.73 to the difference between United's collectible claim of $8,026.43 and $421.92, the amount theretofore paid by Western, to wit $7,604.51.

The real question, therefore, is: Under the provisions of paragraph 7(a) of the lease agreement hereinbefore quoted, is United obligated to indemnify Western against loss of all or part of a no claim bonus, to which Western would be entitled in the event no claims were made under the hull insurance on its fleet during the year specified in a policy negotiated by Western with Lloyds, without the knowledge of United, and almost five months after the making of the lease agreement?

Respondent, in support of the court's conclusion that Western was entitled to the offset of $7,161.78 under said paragraph 7(a), cites *Alberts* v. *American Cas. Co.*, 88 Cal.App.2d 891, 900 [200 P.2d 37], and quotes: "The contract is to be liberally construed in favor of the indemnitee . . ., all fair doubts are to be resolved in favor of the indemnitee . . . and a construction permitting recovery is favored . . ." Completely

ignored by respondent are the words immediately following and a part of the same sentence from which it has quoted the above, to wit: ". . . *but the undertaking of the indemnitor may not be extended by construction or implication beyond the terms of the contract.* (Citing authority.)" (Emphasis added.)

Indemnity agreements, like other contracts, "must be so interpreted as to give effect to the mutual intention of the parties as it existed *at the time of contracting,* so far as the same is ascertainable and lawful." (Civ. Code, § 1636. Emphasis added.)

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that *the parties intended to contract.*" (Civ. Code, § 1648. Emphasis added.)

"Particular clauses of a contract are subordinate to its general intent." (Civ. Code, § 1650.)

The contract which gave rise to the instant action is not an insurance policy, to be construed against an insurance company which prepared and printed a policy in language difficult for an assured to read and understand. The agreement to be construed on the appeal now engaging our attention is a lease. Its terms were admittedly arrived at by negotiation between two parties equally familiar with the air transport business. As originally drawn the hull insurance (as is provided regarding liability insurance) was to be procured by United; but, at the suggestion of Western and in order to avoid red tape with War Assets Administration, that provision was changed to read: "Hull insurance acceptable to War Assets Administration and United shall be procured by Western and paid for by United"; and United agreed that the then existing Springfield policy was "acceptable" to it.

As pointed out by Western, United could not have collected its claim for $8,026.43 under the terms of the Springfield policy, and has lost nothing because of Western's substitution of the Lloyd's policy for the Springfield policy, except the increase in premium paid by United to Western. From this, Western argues United should not be allowed to collect its present loss under the Lloyd's policy.

However, the lease agreement should receive the same interpretation in the instant action as it would receive under other conditions. For instance, if Western had had no losses and United's loss had been $43,000, under the trial court's interpretation United then would have been obligated to expend

$43,000 of its own money to repair the plane before returning it to Western, and could have collected nothing on the hull insurance because the "no claims bonus" and the deductible exceeded the cost of repair. Under those circumstances Western's change of insurance would have cost United $18,000 in addition to the increased premium; and, if the crash had destroyed the plane, United's loss because of Western's change of insurance could have included the $75,000 decrease in maximum coverage in addition to the $30,000 no claim bonus and the increased premium. Consequently, it is clear that the difference in the rights of the parties under the Springfield and Lloyd's policies are in no way determinative of the question now engaging our attention.

A reading of paragraphs 7 and 8 together and in connection with the remainder of the lease agreement indicates that paragraph 7, as a whole, is intended to indemnify Western against "any and all expense, loss or damage caused by or arising out of . . . the possession or operation by United of said aircraft . . ." Subparagraphs (b), (c) and (d) set forth the extent of United's obligation to Western in the event of damage to the airplane itself. Paragraph 8 requires United to "maintain in full force and effect at its own expense insurance policies" covering liability to passengers and the public for personal injuries and property damage, and to reimburse Western for the premium on hull insurance on the leased plane. There is no indication of an intent that insurance on the leased plane should be conditioned upon Western's other loss experience, or in any other way different from the insurance on the other planes belonging to Western.

Undoubtedly, paragraph 7(a) was intended to cover the other items of expected "expense, loss or damage caused by or arising out of . . . the possession or operation" of the leased airplane, particularly the items to be covered by the first four policies of insurance required by paragraph 8, to wit, liability to passengers and the public for personal injuries and property damage. There is no provision here that United shall hold Western harmless for its loss of any "no claim bonus" or "retrospective rate credit" under the terms of a policy to be issued in the future. Nor is there any need to imply such an intent in order that subparagraph 7(a) shall have effect. Its meaning is clear when it is considered with the remainder of the agreement.

Paragraphs 7(b) and (c) are clear and specific as to United's liability to Western under the circumstances which gave rise

to the instant action. United shall "reimburse Western for any and all damage to said aircraft and any engines, propellers, parts, accessories and radio equipment . . ." and ". . . be responsible for the payments for the use of said aircraft during the period in which said aircraft is being repaired by United in addition to being responsible for all costs of said repair."

The judgment is reversed and the cause remanded with directions to the court below to enter judgment in favor of plaintiff for the sum of $7,604.51 with interest at seven per cent from February 21, 1949.

Doran, J., and Drapeau, J., concurred.

On May 16, 1955, the opinion and judgment were modified as printed above and a petition for rehearing was denied. Respondent's petition for a hearing by the Supreme Court was denied June 16, 1955.