[Civ. No. 36204. First Dist., Div. One. Aug. 18, 1976.]

HERMAN CHRISTENSEN & SONS, INC.,
Cross-complainant and Appellant, v.
PARIS PLASTERING COMPANY, Cross-defendant and Appellant;
BAY AREA SCAFFOLDING, INC., Cross-defendant and Respondent.

238

COUNSEL

Rankin, Sproat, Archer & Rankin, Joseph F. Rankin and Richard G. Logan for Cross-complainant and Appellant.

Bruce D. Starkey for Cross-defendant and Appellant.

No appearance for Cross-defendant and Respondent.

OPINION

**SIMS, Acting P. J.**—Cross-defendant, a subcontractor, has appealed from a judgment awarding cross-complainant, a general contractor, indemnity after the latter had suffered a verdict and judgment in an action brought by the subcontractor's employee for injuries suffered in a fall from a scaffold furnished by the general contractor.[1] The subcontractor contends that the indemnity clause in the contract between it and the general contractor fails to comply with the provisions of section 3864 of the Labor Code, and on its face does not relieve the general contractor from liability for its own negligence. It also asserts that the court erred in finding that the general contractor was only passively negligent, and that the subcontractor was actively negligent. Those contentions are examined and found wanting. The judgment must be affirmed.

---

[1] The supplier from whom the general contractor had leased the scaffolding was exonerated by the verdict of the jury in the personal injury trial.

A cross-appeal, in which the general contractor sought review of an order of the court that denied its tardy motion to amend its complaint to show that the subcontractor breached its agreement to furnish the general contractor with liability insurance, is dismissed as moot.

The injured employee, Oxner, was employed as a hod carrier for the subcontractor for this particular job. He had worked with various construction firms as a hod carrier for approximately 14 years. On March 15, 1971, at about 9 a.m., Oxner, while working on the scaffolding, leaned against the guard rail with his right hand whereupon the rail gave way. As a result, he fell to the ground sustaining serious injuries.

The pertinent testimony adduced at trial indicates the following:

According to Melvin Portue, owner of the scaffolding company, who was at the scene of the accident minutes after it occurred, the guard rail had been changed since it was originally erected and was not the way it was supposed to be. On the particular part of the scaffolding from which Oxner fell, the guard rail was longer than its corresponding bay. Thus, as was the custom in the industry, the rail was originally bolted at one end and wired in two places at the other. After the accident Portue noticed the guard rail was wired where it had originally been bolted and wired differently in only one place where it had originally been wired. Additionally he testified to having noticed the original bolt had been removed in that there was no rust or crystallization where it had been attached.

There was no direct evidence as to who actually altered the fastening on the guard rail involved. However, there was considerable testimony that at different times various trades would, against orders of the superintendent of the general contractor, remove and replace guard rails in order to move in materials. As to this particular guard rail, Joseph Houston, acting superintendent for the contractor, testified he had been on the scaffolding the previous week inspecting the lathers' work and that the rail was not protruding into the work area or irregularly fastened. He stated he would have noticed its irregularity had it been in that condition at that time. After the above inspection of the accident area of the scaffolding up to the day of the accident, there had been no scheduled work in that area.

Houston also testified that in order to make sure the scaffolding was maintained safely, he had to inspect it constantly. Thus every morning

Houston would look to see if the scaffolding was all right when he took his daily "head count" of the different trades working on the job. He further stated he could observe the scaffolding as well from the ground as on the scaffolding and that he actually mounted the scaffolding only when there was some particular work he wanted to inspect. (Melvin Portue also stated he could get a better view from the ground than from the air regarding the condition of the scaffolding.) On the morning of the accident, Houston had looked up at the area of the scaffolding from which Oxner later fell and had seen nothing wrong. According to Houston, if he had seen the guard rail the way it was just before the accident, he would have corrected it.

At the time just before the accident three of the subcontractor's employees, Joe Solis (a plasterer), Bill Ward (the foreman), and Oxner testified that the guard rail protruded into the working area, so much so, the workers either had to duck under it or squeeze between the rail and the wing wall. The foreman Ward testified he had assembled scaffolds for smaller jobs, and also that he had noticed there was an "unusual position of wiring on the guard rail" which later gave way. However, he had felt it did not look unsafe and thus there was no reason to check further or to change it.

The indemnity clause reads as follows: "(h) to indemnify the contractor against and save him harmless from any and all claims, suits or liability for injuries to property, injuries to persons including death, and from any other claims, suits or liability on account of any acts or omissions of the subcontractor or any of his officers, employees or servants."

Other facts appear below.

I

Section 3864 of the Labor Code provides: "If an action as provided in this chapter prosecuted by the employee, the employer, or both jointly against the third person results in judgment against such third person, or settlement by such third person, the employer shall have no liability to reimburse or hold such third person harmless on such judgment or settlement in absence of a written agreement so to do executed prior to the injury."

The history behind the enactment of this section, and its purpose recently have been expostulated as follows: "Prior to 1959, an employer of an employee, injured as the result of the joint negligence of the employer and a third party, was subject to the doctrine of implied indemnity and, like any other joint tortfeasor, was required to indemnify the third party for any judgment recovered by the employee against the third party when the negligence of the employer was active and the negligence of the third party was passive. [Citations.] However, in 1959 the California Legislature, to eliminate the dual insurance burden imposed upon the employers of this state by the workers' compensation law and the implied indemnity doctrine, enacted section 3864 of the California Labor Code. [Citations.]

"Under this section the employer of an employee who is injured as the result of the joint negligence of the employer and a third party is no longer required to indemnify the third party in the absence of an express indemnification agreement [Citations.] As the appellate court explained in *City of Sacramento* v. *Superior Court* (1962) 205 Cal.App.2d 398, 405 . . : ' . . . the Legislature met in 1959 and it is the theory of the authors of the article quoted above [Conley & Sayre, *Rights of Indemnity* (1961) 13 Hastings L.J. 214, 219-220, fn. 29] that "The California legislature felt that this double burden placed upon the employer was in contravention of the exclusive remedy theory of the [workers'] compensation statutes" and that the 1959 addition to the Labor Code under discussion was the result and that its effect was only to abolish "the right of indemnity by the third person against the injured employee's employer on the theory of implied contract. In order to recover in indemnity the third party must now rely on an *express* contract. . . ." We join in this belief.' " (*E. B. Wills Co.* v. *Superior Court* (1976) 56 Cal.App.3d 650, 653-654 [128 Cal.Rptr. 541]. See also *De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 226, fn. 6 [70 Cal.Rptr. 550, 444 P.2d 342]; *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 584 [126 Cal.Rptr. 267]; *Pacific Gas & Elec. Co.* v. *Morse* (1970) 6 Cal.App.3d 707, 712-713 [86 Cal.Rptr. 7]; and *Western Gulf Oil Co.* v. *Oilwell Service Co.* (1963) 219 Cal.App.2d 235, 241 [33 Cal.Rptr. 20].)

In *Morgan* v. *Stubblefield* (1972) 6 Cal.3d 606 [100 Cal.Rptr. 1, 493 P.2d 465], the subcontractor agreed to hold the general contractor harmless " 'from all claims for damages to persons . . . caused by subcontractor or which result from subcontractor's operation or defective work . . . .' " (6 Cal.3d at p. 626.) The court reversed a judgment, which

indemnified the contractor for damages awarded against it for injuries suffered by the subcontractor's employee on a jury verdict which impliedly found that the contractor had been guilty only of passive negligence, because the evidence showed that the contractor was guilty of active negligence as a matter of law (6 Cal.3d at pp. 626-627). In *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411 [340 P.2d 604], the court found that the language of the agreement, although broader than that used here, fell short of expressing the indemnitee's intention to exculpate itself from its own sole negligence. (52 Cal.2d at pp. 415 and 416.)

■ In reliance on the foregoing precedents, the subcontractor here urges that since the language "any and all claims, suits or liability for . . . injuries to persons" does not cover liability arising from the active and co-existing negligence or the sole negligence of the contractor, it may properly be limited to exclude liability to reimburse the contractor for its liability to the employee of the subcontractor unless that liability is expressly referred to. He states, and we have found nothing to the contrary, that this case is the first to raise the question of how specific the written agreement required by section 3864 must be.

In *Morgan* v. *Stubblefield, supra,* it would not have been necessary for the court to determine the issue of whether the contractor's negligence was active or passive unless it felt that the language, which is similar to that used here, was sufficient to include the claim of an employee of the subcontractor among the "all claims for damages to persons" referred to in the indemnity agreement. In *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97], the indemnity agreement given by the contractor to the owner covered "all claims for damages to persons." The trial court "declared that the indemnity agreement was sufficiently explicit to cover the accident" to the contractor's employee (13 Cal.3d at p. 627). Here again the issue on appeal was whether the owner's negligence was active or passive, and the trial court's finding it was the latter, and its award of indemnity to the owner were upheld (*id.,* at pp. 629-631).

The foregoing precedents, while revealing a general understanding that a clause referring to "all claims for injuries to persons" will include injuries to an employee of the indemnitor, do not squarely meet the issue posed by the subcontractor. The commentator's statement, "In order to recover in indemnity the third party must now rely on an *express* contract of indemnity between himself and the injured employee's

employer" (Conley & Sayre, *Rights of Indemnity* (1961) 13 Hastings L.J. 214, 220, fn. 29, quoted in part as set forth above), refers, when read in context, to the distinction between the implied contract theory of indemnity and an actual written agreement of indemnity. It does not purport to define what words must be included in the express contract.

The statute does make clear what was already the law. "Where . . . the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity. [Citations.]" (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 628. See also *Markley* v. *Beagle* (1967) 66 Cal.2d 951, 961 [59 Cal.Rptr. 809, 429 P.2d 129]; *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 417-418 [105 Cal.Rptr. 725] [hg. den. Feb. 8, 1973]; and *J. A. Payton* v. *Kuhn-Murphy, Inc.* (1967) 253 Cal.App.2d 278, 282 [61 Cal.Rptr. 575].) In *Western Gulf Oil Co.* v. *Oilwell Service Co., supra,* the court reversed a judgment of dismissal entered after a demurrer was sustained without leave to amend in an action for declaratory relief to determine whether an indemnity clause covered the owner's liability to employees of the contractor. The court stated, "The respondent accepted its general undertaking at its sole risk and expense, agreed to assume and bear all risk of accident and damages to persons or property which might occur in the course of such operation, and further agreed to carry adequate compensation, public liability and employer's liability insurance, and to save harmless and indemnify the owner from all liability of every kind either to persons or property. While the word 'all' appears to need no definition, including everything and excluding nothing, the intention of the parties to include or exclude indemnity as to the actions of the appellant is a matter that would have to be determined by the trial court." (219 Cal.App.2d at pp. 241-242.) In *Markley* v. *Beagle, supra,* the court noted: "In the absence of conflicting extrinsic evidence the interpretation of the contract is a question for the court. [Citation.]" (66 Cal.2d at p. 962.)

"An indemnity provision of a contract is to be construed under the same rules governing other contracts with a view of determining the actual intent of the parties. [Citations.]" (*J. A. Payton* v. *Kuhn-Murphy, Inc., supra,* 253 Cal.App.2d 278, 281. See also Civ. Code, § 1636; *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A. G.* (1970) 3 Cal.3d 434, 442 [91 Cal.Rptr. 6, 476 P.2d 406]; and *United Air Lines* v. *Western Air Lines* (1955) 132 Cal.App.2d 308, 315 [282 P.2d

118].) "The applicable principles are (a) the agreement for indemnification must be strictly construed against the indemnitee, and (b) in order to include acts amounting to active or affirmative negligence, the indemnity provision must be clear, positive and specific to that effect. [Citations.]" (*Burlingame Motor Co.* v. *Peninsula Activities, Inc.* (1971) 15 Cal.App.3d 656, 663 [93 Cal.Rptr. 376]. See also *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 628; and *Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* 52 Cal.2d 411, 414-415 and 416.)

In applying the foregoing rules we recognize that it is possible to draw an agreement that specifically refers to "any person or persons including employees . . ." of the indemnitor. (See *Harvey Mach. Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445, 447 [6 Cal.Rptr. 284, 353 P.2d 924].) Nevertheless, we are of the opinion that the language "any and all claims, suits or liability for . . . injuries to persons" is broad enough to cover such persons as may be employed by the indemnitor in view of the plain meaning of the language. (See *Western Gulf Oil Co.* v. *Oilwell Service Co., supra,* 219 Cal.App.2d 235, 242.) No extrinsic evidence was offered to support a contrary conclusion.

In *Pacific Gas & Elec. Co.* v. *Morse, supra,* the question was whether section 3864 precluded action against the employer's public liability carrier in a situation where there was no express agreement. In construing the statute the court observed: "Essentially, these contentions pose a problem of statutory interpretation. Plaintiff cites the traditional 'plain meaning' rule, which precludes judicial interpretation of a statute free from ambiguity. Literal construction will not prevail if it is opposed to legislative objective. [Citations.] In construing one of the very statutes confronting us here, Labor Code section 3864, the Supreme Court has placed it against the background of the judicial decisions preceding its 1959 enactment. Moreover, the court has applied the presumption that the enactment was intended to change the law. [Citation.]" (6 Cal.App.3d at p. 712.) When viewed in the light of the legislative purpose of section 3864, there is no violence done to the object of relieving the employer of the burden imposed by the theory of implied liability in holding that the plain language of his agreement bound him to indemnify the general contractor. The case last cited suggests another objective—to reduce the cost of public liability insurance for the whole enterprise. (See 6 Cal.App.3d at pp. 712-713.) That argument has a false quality. The protection offered by section 3864 to the employer does not reduce the overall cost of insurance. The owner and general contractor must secure and pay for insurance for their possible liability to employees of the

subcontractor. The only purpose of the statute is to prevent shifting that burden without a written agreement to do so. The only way to reduce the cost would be to provide that the workman must take workmen's compensation in lieu of all rights against others engaged in the general enterprise in which he is engaged. The policy of the law is contrary to that result. (See Lab. Code, § 3852.)

The trial court did not err in finding, insofar as section 3864 is concerned, that under the written contract the subcontractor was obligated to indemnify the general contractor.

## II

In *MacDonald & Kruse, Inc.* v. *San Jose Steel Co., supra,* the court divided contractual indemnity provisions into the following three classifications and summarized as follows: "Therefore, when an indemnitor expressly promises to be responsible for the indemnitee's own negligence, the indemnitor will be responsible for even active negligence on the part of the indemnitee; when an indemnitor expressly promises to be responsible for the indemnitee's liability ' "regardless of responsibility for negligence" ' (*id.* [*Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40 (41 Cal.Rptr. 73, 396 P.2d 377)] at p. 46), the indemnitor will be responsible for the indemnitee's passive negligence, but not for the indemnitee's active negligence; and when an indemnitor expressly promises to be responsible for the indemnitee's liabilities caused by the indemnitor, but does not promise to be responsible for the indemnitee's liabilities caused by other than the indemnitor, the indemnitor will be held responsible for the indemnitee's liabilities that result 'solely' (*id.,* at p. 49) from the indemnitor's negligence, but will not be responsible for the indemnitee's liabilities where the indemnitee's 'negligence contributed to' the liability (*id.,* at p. 49)." (29 Cal.App.3d at pp. 420-421.)

That court concluded as follows: "In the contract between MacDonald and San Jose, San Jose expressly promised MacDonald that San Jose would hold MacDonald 'free and harmless from any . . . liability . . . caused by [San Jose], its agents or employees.' Since San Jose's promise did not purport to indemnify MacDonald for liabilities caused other than by San Jose, and since MacDonald's own negligence, whether active or passive, was also a cause of MacDonald's liability, MacDonald is not indemnified by San Jose under this provision. [Citation.]" (29 Cal.App.3d at p. 421.)

■ Here the subcontractor contends that irrespective of the persons covered (see pt. I) under the foregoing analysis, he cannot be held liable on the indemnity agreement when there is concurrent negligence, whether active or passive, because he only agreed to indemnify for claims, suits or liability which arose solely from "any acts or omissions of the subcontractor or any of his officers, employees or servants." The fact that this interpretation renders the indemnity agreement illusory because in the absence of some negligence, active or passive, on the part of the indemnitee there would be nothing for which it could seek indemnity other than costs of suit, the fact that the judgment was properly reversed because the indemnitee was actively negligent as a matter of law, and the fact that only two judges joined in the classification established, all lead us to reexamine that part of the decision, despite the fact that the Supreme Court denied a hearing.

In *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* on which the court relied for the creation of the third class of agreement, there was no express indemnity clause in the contract between the contractor who claimed indemnity, and the subcontractor whose employee was injured (62 Cal.2d at p. 42,. fn. 1). The contractor relied upon the subcontractor's promise to be bound toward it to the same extent as the contractor was bound to the owner under the general contract "to the extent of the work provided for in this agreement." The court applied the following test: "In view of the general rule that an implied indemnity does not reach to protect the indemnitee from a loss to which his negligence has contributed, we must look at least for an express undertaking in the document that he is to do so. If one intends to do more than merely incorporate the general rule into the written document, he will be required to fix the greater obligation in specific terms. And the extent of the purported indemnitor's liability must be determined from an objective assessment of the language of the instrument." (*Id.,* p. 44.)

After reviewing pertinent authorities and the clauses of the two contracts the opinion concluded, "We can conceive that the provision be read, as Ecco claims, to limit Ecco's indemnification to a loss which directly related to its work and resulted from a breach of a duty arising from the performance of that work. . . . In the special circumstances of this undertaking of the subcontractor to hold the contractor harmless for its own negligence and in the use of this printed form contract for that purpose, we hold that the imposition of the obligation must be clear and express. . . . Thus we cannot uphold the ruling that the subcontract

required indemnification if Clovis' negligence contributed to the injury. The provision would apply only if the injury resulted solely from Ecco's negligence." (*Id.,* pp. 47, 48 and 49.) The court distinguished *Indenco, Inc.* v. *Evans* (1962) 201 Cal.App.2d 369 [20 Cal.Rptr. 90], because in that case the injury to the subcontractor's employee resulted from conduct directly related to the work to be performed by the subcontractor and as a result of a breach of legal duty to provide a railing which the contractor had lawfully delegated to the subcontractor. (*Id.,* pp. 47-48.) Reference to the latter case reflects that there was an indemnity clause running from the subcontractor to the contractor that is identical with the one in this case; and, that, as in this case, the subcontractor agreed " 'to comply with all laws, ordinances and regulations bearing on his work and the conduct thereof.' " (201 Cal.App.2d at p. 371.) In that case there was an additional covenant, as in *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* that the subcontractor would assume toward the contractor all the responsibilities it assumed toward the owner insofar as the subcontractor's operations were concerned, and the contractor had given the owner a broad indemnity agreement. (*Id.,* at p. 372.) It, therefore, appears that *Indenco, Inc.* v. *Evans,* rather than *Goldman* v. *Ecco-Phoenix Elec. Corp.* should have controlled in *MacDonald & Kruse, Inc.* v. *San Jose Steel Co., supra,* on the issue involved in this case. (See Cole, J. (assigned) dissenting, 29 Cal.App.3d at pp. 426-429.)

In any event we believe that the concurrent negligence which will preclude an indemnitee from recovery under a clause such as involved in the instant case must be active negligence. This conclusion is strengthened by the analysis found in *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* where the court stated, "Past cases have held that an indemnity agreement may provide for indemnification against an indemnitee's own negligence, but such an agreement must be clear and explicit and is strictly construed against the indemnitee. (*Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 . . .) If an indemnity clause does not address itself to the issue of an indemnitee's negligence, it is referred to as a 'general' indemnity clause. (See *Markley* v. *Beagle, supra,* at p. 962; *Morgan* v. *Stubblefield* (1972) 6 Cal.3d 606, 624 . . .) While such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent. (*Markley* v. *Beagle, supra,* at p. 962; *Morgan* v. *Stubblefield, supra,* at p. 624; see also *Burlingame Motor Co.* v. *Peninsula Activities, Inc.* (1971) 15 Cal.App.3d 656, 661. . . .)

"Provisions purporting to hold an owner harmless 'in any suit at law' (*Markley* v. *Beagle, supra,* at p. 961), 'from all claims for damages to persons' (*Morgan* v. *Stubblefield, supra,* at p. 626), and 'from any cause whatsoever' (*MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 422-423 . . .) without expressly mentioning an indemnitee's negligence, have been deemed to be 'general' clauses." (13 Cal.3d at pp. 628-629.)

From the foregoing it is clear that *Markley* v. *Beagle, supra,* and *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* must be read together. (See also *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 256-257 [85 Cal.Rptr. 178, 466 P.2d 722].) The provisions found in this case and *Indenco, Inc.* v. *Evans, supra,* require the indemnitor to indemnify the indemnitee for "any and all claims . . . for injuries to persons . . . on account of any acts or omissions of the" indemnitor, despite the passive negligence of the indemnitee. The finding of the trial court is sustained on the facts and the law.

## III

The trial court found that the general contractor "passively failed to furnish the plaintiff [employee] with a safe place to work." The findings refer to the special verdict of the jury in the action against the general contractor and the supplier, as follows: "On the issues framed by the complaint in intervention the jury found that PARIS was negligent and that such negligence was a proximate cause of plaintiff's injury."[2]

---

[2]Interrogatories propounded to the jury were answered as follows:
"Question One: Was Paris Plastering Co. negligent?
"Yes:__Yes__ No:_____
"If you have answered Question One in the affirmative: Question Two: Did that negligence concur with the negligence of either or both of the Defendants as a proximate cause of the injuries and damages suffered by the Plaintiff?
"Yes:__Yes__ No:_____
"Question Three: Did Paris Plastering Co. discover the defect in the product which caused Plaintiff's injury?
"Yes:__Yes__ No:_____
"If you have answered Question Three in the affirmative: Question Four: Was Paris Plastering Co. aware that this defect presented a danger to its employees who used the product?
"Yes:_____ No: __No__
"If you have answered Questions Three and Four in the affirmative: Question Five: Did Paris Plastering Co., even though it was aware of the defect in the product and of the danger it presented, allow plaintiff to use this product?
"Yes:_____No:_____"

The court further found: "The plaintiff's injury was proximately caused by the concurrent negligence of PARIS and CHRISTENSEN. The Court finds that the negligence of PARIS was active and primary, and that the negligence of CHRISTENSEN was passive and secondary."

The subcontractor attacks those findings and claims that the evidence requires a finding that the contractor was actively negligent as a matter of law, and that, in any event, there was no active negligence on the part of its employees which contributed to the accident.

■ The applicable principles and controlling precedents are found in *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* as follows: "Passive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law. (*Markley* v. *Beagle, supra,* at p. 962; *Morgan* v. *Stubblefield, supra,* at pp. 624-625; see also *Cahill Bros., Inc.* v. *Clementina Co., supra,* at p. 382.) Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform. (See *Morgan* v. *Stubblefield, supra,* at p. 625, and *Cahill Bros., Inc.* v. *Clementina Co., supra,* at p. 382.) 'The crux of the inquiry is to determine whether there is participation in some manner by the person seeking indemnity in the conduct or omission which caused the injury beyond the mere failure to perform a duty imposed upon him by law.' (*Morgan* v. *Stubblefield, supra,* at p. 625.)

"Whether conduct constitutes active or passive negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact; active negligence may be determined as a matter of law, however, when the evidence is so clear and undisputed that reasonable persons could not disagree. (See *Morgan* v. *Stubblefield, supra,* at pp. 625, 627; *Cahill Brothers, Inc.* v. *Clementina Co., supra,* at pp. 382-383; see also *Pearson Ford Co.* v. *Ford Motor Co.* (1969) 273 Cal.App.2d 269, 275 . . .)

"Passive negligence has been found or assumed from the failure to discover a defective condition created by others (*Markley* v. *Beagle, supra,* at pp. 955-956, 962), failure to exercise a right to inspect certain work and specify changes (*Muth* v. *Urricelqui* (1967) 251 Cal.App.2d 901, 911 . . .), and failure to exercise a supervisory right to order removal of defective material (*Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins.*

*Co.* (1962) 202 Cal.App.2d 99, 111-113 . . .). Active negligence has been found in digging a hole which later caused an injury (*Morgan* v. *Stubblefield, supra,* at pp. 626-627), knowingly supplying a scaffold which did not meet the requirements of a safety order (*id.,* at pp. 625-626), creating a perilous condition that resulted in an explosion (*Burlingame Motor Co.* v. *Peninsula Activities, Inc., supra,* at p. 661), and failing to install safety nets in violation of a contract (*MacDonald & Kruse, Inc.* v. *San Jose Steel Co., supra,* at pp. 424-425)." (13 Cal.3d at pp. 629-630.)

-A-

■ The subcontractor alleges the general contractor was actively negligent in that its employees performed the inspection of the scaffolding in a negligent manner. Specifically, it claims that the general superintendent did not go up on the scaffold to inspect it, and thereby did not discover and correct the defect which created the danger, resulting in plaintiff's injury.

In the present case the direct cause of the guard rail being improperly attached and therefore defective was never ascertained. The general contractor's superintendent, in pursuance of his duty to provide the plaintiff with a safe place to work, made a daily inspection. This inspection was usually made from the ground rather than on the scaffolding itself. Both the superintendent and the builder of the scaffolding testified it could be seen at least as well from the ground. On the day of the accident the superintendent had looked at the area of the scaffolding from which the defectively attached guard rail subsequently gave way, and had seen nothing unusual or improper. From the above, it appears the trier of fact had substantial evidence to conclude the general contractor was guilty solely of nonfeasance for its failure to discover the dangerous condition of the scaffolding. There was evidence to substantiate an inspection was made and that it is reasonable to inspect the scaffolding from the ground.

-B-

■ Three Paris employees, including the foreman, noticed the unusual position of the guard rail in that it protruded into the work area. All three had years of experience working on scaffolding. The foreman, who also had erected a similar scaffolding in the past, testified to noticing the guard rail was not attached properly. However, all three concluded the guard rail was safe and did nothing to actually check its strength.

Granted the guard rail gave way with the plaintiff only grabbing it with his right hand, its dangerous condition could easily have been determined by simply shaking it. Under these circumstances, the trier of fact could reasonably conclude the failure of those on the scene to detect the rail's dangerous condition was active negligence.

■ The foregoing issues are governed by the rule that when a finding of fact is attacked on the ground there is not any substantial evidence to sustain it, the power of the appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact. Additionally, in reviewing the evidence, all conflicts must be resolved for the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict where possible. Also, when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (See *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693-694 [299 P.2d 231]; and *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 861 [111 Cal.Rptr. 833]. Note also *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 630-631.)

The findings of the trial court are sustained by substantial evidence.

IV

The contractor has acknowledged that his cross-appeal should be considered as moot if the judgment is affirmed. It is, therefore, unnecessary to consider his contention that the trial court erred in denying its motion, at the time of trial, to amend its cross-complaint.

The judgment is affirmed.

Elkington, J., and Bray, J.,* concurred.

The petition of the cross-defendant and appellant for a hearing by the Supreme Court was denied October 14, 1976.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.